UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIV. 06-4016-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER GRANTING |
| TWO BANK ACCOUNTS | ) | GOVERNMENT'S MOTION |
| DESCRIBED AS: | ) | FOR SUMMARY JUDGMENT |
| | ) | |
| Bank Account | ) | |
| In the amount of $197,524.99 | ) | |
| Bank of America | ) | |
| Seattle, Washington | ) | |
| | ) | |
| Bank Account | ) | |
| In the amount of $20,537.42 | ) | |
| Bank of America | ) | |
| Seattle, Washington | ) | |
| | ) | |
| Defendants. | ) | |

The government moves for summary judgment in relation to two bank

accounts that it seized pursuant to a civil forfeiture action: a bank account in

the name of Dataport, Inc., located at Bank of America, Seattle, Washington,

in the amount of $197,524.99 (Dataport account) and a bank account in the

name of Turbo ISP, Inc., located at the Bank of America, Seattle, Washington,

in the amount of $20,537.42 ( Turbo ISP account).  Timothy Jewell, who

claims an interest in these bank accounts, appearing pro se, opposes the motion.  The motion is granted.

## BACKGROUND

On January 20, 2006, the government commenced a civil forfeiture action entitled <u>United States v. Two Bank Accounts</u>, Civ. No. 06-4016.  Jewell claimed an interest in both of the bank accounts: the Dataport and Turbo ISP accounts.

The government moves for summary judgment as to both bank accounts.  The government argues that Jewell did not have Article III standing to contest the forfeiture of the accounts.  The court reserved ruling in relation to the Dataport and Turbo ISP accounts, determining that the record was inadequate to resolve the issue of Jewell's Article III standing.  The court requested that the government and Jewell submit supplemental briefs addressing the assignment from Harvey Dockstader, Jr. to Jewell and whether that assignment was valid to vest Jewell with Article III standing.  Because both parties have filed their supplemental briefs regarding this issue, the court will now rule on the issue of Jewell's Article III standing as to the Dataport and Turbo ISP accounts.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists. Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

**DISCUSSION**

Jewell could establish Article III standing either based on the assignment or his security interest in the Dataport and Turbo ISP accounts. The court will address both separately.

**I.      Jewell's Article III Standing Based Upon the Assignment**

On July 17, 2006, Harvey Dockstader, Jr. (Dockstader) filed a "Statement of Interest or Right (Claim)" in relation to the Dataport and Turbo ISP accounts, stating that those funds were not used to commit or facilitate the commission of a crime. Docket 14. Approximately three months later, on October 9, 2007, Dockstader filed a "Statement of Release in Interest or Right (Release Claim)," which was erroneously docketed as a motion to quash a subpoena. Docket 49. Two days later, on October 11, 2007, the government wrote a letter to Dockstader, explaining his withdrawal of claim had been docketed as a motion to quash a subpoena and suggesting that Dockstader clarify whether he intended to withdraw his claim with regards to the bank accounts. Docket 51. On October 17, 2007, after reviewing Dockstader's October 9, 2007, filing and the government's October 11, 2007, letter, the court determined that Dockstader's October 9, 2007, filing was, in fact, a release of his claim in these proceedings. As a result, the court dismissed the

claim of Dockstader with prejudice.[1]  Docket 52.  On October 18, 2007, a fax

from Dockstader was docketed that indicated that he no longer had any claim

in the case and all previous claims had been assigned to Jewell, who was

another claimant in the case.  Docket 57.  On October 22, 2007, Dockstader

filed another document entitled "Statement of Release in Interest or Right

(Release of Claim)," which clarified that he intended to release his claims in

the case.  Docket 58.  Based upon the record, Dockstader has released his

claim in this case and therefore is no longer an interested claimant with

respect to the Dataport and Turbo ISP accounts.  But Dockstader represented

that he assigned his claims to Jewell.  Therefore, the court must determine

whether the assignment resulted in Jewell acquiring Article III standing as to

the Dataport and Turbo ISP accounts.

## A.     Applicable Law

In the context of the Article III standing determination, "ownership

interests are defined by state law."  United States v. Premises Known as 7725

Unity Ave., N. Brooklyn Park, Minn., 294 F.3d 954, 956 (8th Cir. 2002).  Here,

the action was commenced in South Dakota, the bank accounts are located in

Washington, the assignment was executed in Arizona, and the only remaining

---

[1] In its order, the court stated that any party who disagreed with the
dismissal was required to make a motion to set aside the dismissal within
twenty days of the date of the order.  Docket 52.

interested party, Jewell, resides in Wisconsin.  The court applies federal choice-of-law canons because this is a federal question case.  See Prudential Ins. Co. of America v. Doe, 140 F.3d 785, 791 (8th Cir. 1998).  But prior to applying federal choice-of-law rules, the court must first determine whether a conflict exists between the laws of the different states.  Surgidev Corp. v. Eye Tech., Inc., 648 F. Supp. 661, 679-80 (D. Minn. 1986), aff'd, 828 F.2d 452 (8th Cir. 1987).  Because the outcome would be the same under all four state laws, the court need not decide which state law to apply when determining whether Jewell has Article III standing based on the assignment.  Rather, the court will consider and apply all four state laws because the result is the same.

**B.     Meaning of Assignment**

"An assignment will be interpreted or construed in accordance with the rules of construction governing contracts generally, the primary object being to ascertain and carry out the intention of the parties."  6A C.J.S. Assignment § 86.  See also 6 Am. Jur. 2d Assignments § 109 (stating that "[a]n assignment will ordinarily be construed in accordance with the rules of construction which govern contracts and the circumstances surrounding the execution of the assignment document").  Contract interpretation is a question of law to be determined by the court.  LaMore Restaurant Group, LLC v. Akers, 748 N.W.2d 756, 761 (S.D. 2008).  When determining the meaning of a contract, "effect will be given to the plain meaning of its words."  In re Dissolution of

Midnight Star Enters., L.P., 724 N.W.2d 334, 337 (S.D. 2006) (additional

citation omitted).  The court examines "the language that the parties used in

the contract to determine their intention."  Pauley v. Simonson, 720 N.W.2d

665, 667-68 (S.D. 2006) (citation omitted).  If the parties' intention is made

clear by the language of the contract, the court must declare and enforce it.

Id. at 668.  But if the contract "is uncertain and ambiguous, parol and

extrinsic evidence may be used for clarification."  Id. (internal quotations and

citations omitted).[2]

Here, Dockstader signed a document entitled "Assignment of

Defendants' Funds Pursuant to Perfected Security Interest and Authorization

for Payment from Registry of Court."  Docket 49 at 5.  The assignment

explained that Dataport, Inc. (Dataport) and Turbo ISP, Inc. (Turbo ISP),

assignors, were indebted to Jewell, assignee, and that the debt was secured by

a perfected security interest in all of the corporations' assets.  Id.  The

assignment stated that "[i]n consideration of assignee's perfected security

interest, assignors hereby assign to assignee the right to receive any of the

'defendant funds' seized in this case and turned over to the U.S. Marshal

Service for the District of South Dakota."  Id. at 6.  The assignment also

---

[2] Arizona, Washington, and Wisconsin all recognize similar rules of
contract interpretation.  See, e.g., Tamayo v. Lizarraga, 2008 WL 4416049, at *6
(Ariz. App. Sept. 25, 2008); Sovran, LLC v. Mickelsen Dairy, Inc., 2008 WL
3319816, at *5 (Wash. App. Aug. 12, 2008); and Huml v. Vlazny, 716 N.W.2d
807, 820 (Wis. 2006)

instructed the court to disburse all "defendant/funds" which were released or refunded to Jewell.  Id.  The assignment further provided that the "assignors shall pursue release and/or refund of defendants' funds with due diligence at assignors' expense."  Id.  Finally, the assignment authorized Jewell to file it with the court to ensure that the defendant funds were properly paid to him pursuant to his perfected security interest.  Id. at 6-7.

According to the plain meaning of the words used in the assignment, the court finds that Dockstader, as president of Dataport and Turbo ISP, intended to assign to Jewell the corporations' right to receive the "defendant/funds." Significantly, the assignment does not state that Dockstader, as an individual, was assigning his personal interest in the bank accounts.  Instead, when considered as a whole, the assignment indicates that Jewell is entitled to receive any funds the corporations are entitled to receive.  Accordingly, the court finds that the assignment only grants Jewell the right to receive any money that the government returns from the Dataport and Turbo ISP accounts.

### C.    Requirements of Assignment

For a claimant to establish Article III standing predicated upon an assignment, the assignee must prove that: (1) the assignment was valid and (2) the assignor had an ownership interest in the property.  United States v. 37.29 Pounds of Precious Stones, 7 F.3d 480, 483 (6th Cir. 1993), overruled on

other grounds, <u>United States v. James Daniel Good Real Property</u>, 510 U.S. 43 (1993).  Therefore, the court must analyze the validity of the assignment of the interests and the corporations' ownership interests in the property to determine whether Jewell has Article III standing based upon the assignment.

>        1.        **Valid Assignment**

With regards to the validity of the assignment, Jewell must show that the assignment effectively conveyed to him an interest in the subject property. <u>Id.</u>  Here, the assignment signed by Dockstader as President of Dataport and Turbo ISP indicates a transfer of the rights to the defendant bank accounts from the corporations to Jewell.  The assignment indicates that the corporations were indebted to Jewell and therefore an assignment of their bank accounts was an attempt to repay Jewell.  To determine whether this is accurate and appropriate, the court must examine the agreements entered into between Dockstader, as an individual, and Jewell and the agreements entered into between Dockstader, as president of the corporations, and Jewell. Review of these agreements will reveal whether the corporations or Dockstader, as an individual, were indebted to Jewell and thus whether Dockstader had the authority to assign the Dataport and Turbo ISP accounts to Jewell.

Dockstader and Jewell entered into a stock purchase agreement, under which Dockstader agreed to purchase Dataport and Turbo ISP from Jewell.

Docket 172-2 at 4.  According to the stock purchase agreement, at closing

Dockstader was to pay Jewell $10,000 and provide a promissory note for the

balance of the purchase price.  Id.  The promissory note and other obligations

of Dockstader were to be secured by a "stock pledge and security agreement"

covering the shares and a secured corporate guarantee from each of the

corporations.  Id. at 5.  The promissory note was payable in 42 monthly

installments of principal and interest.  The promissory note was secured by a

"stock pledge and security agreement."  Id. at 15.  Under the "stock pledge and

security agreement," Dockstader granted and pledged to Jewell a security

interest in the shares of the corporation.  The "stock pledge and security

agreement" was given to secure the obligations of Dockstader under the

promissory note.  Id. at 18.  The "stock pledge and security agreement" also

stated that the proceeds of any disposition of the shares could be applied by

Jewell first to the payment of all unpaid costs and expenses and the balance,

if any, to the payments secured by the pledge agreement.  Id. at 20.

Jewell also entered into a guaranty agreement with Dataport and Turbo

ISP.[3]  Docket 172-3 at 1.  The guaranty agreement set forth that Dockstader

entered into a stock purchase agreement for the purchase of all of Jewell's

interest in the shares of the corporations, that Dockstader would pay for the

---

[3] Dockstader signed the guaranty agreement as president of Dataport and
Turbo ISP.  Intware, Inc. was also a party to the agreement but is not relevant
to the current discussion.  Docket 172-3 at 1, 5.

shares by providing a promissory note, and that Dockstader would secure the purchase of the shares with a stock pledge agreement. The guaranty further explained that Dataport and Turbo ISP, jointly and severely, guaranteed and promised Jewell that Dockstader, as an individual, would fulfill his obligations under the agreements. Id. The guaranty agreement also provided that Dataport and Turbo ISP were primarily liable for Dockstader's personal obligations and that if Dockstader defaulted under the agreements, Jewell could proceed immediately against Dataport and Turbo ISP or Dockstader or both. Id. at 1-2. Additionally, Jewell entered into business security agreements with Dataport and Turbo ISP, which granted Jewell a security interest in certain collateral belonging to the corporations. Docket 172-3 at 6, 11. The agreements state that upon request by Jewell, after a default by the corporations, the corporations will put Jewell in possession of the collateral.[4]
Id.

In sum, Jewell entered into various agreements with Dockstader, Dataport, and Turbo ISP. Jewell entered into a stock purchase agreement, a promissory note, and a "stock pledge and security agreement" with Dockstader. Jewell also entered into a guaranty agreement and business

---

[4] Dockstader signed the business security agreements as President of both Dataport and Turbo ISP. Docket 173-2 at 10, 15.

security agreements with Dataport and Turbo ISP.  These agreements are separate and distinct from one another.

Contract rights are generally assignable as long as the assignment does not violate public policy.[5]  <u>Carlile v. Harbour Homes, Inc.</u>, 194 P.3d 280, 283 (Wash. App. 2008) (stating that contract rights may be freely assigned unless prohibited by statute or rendered ineffective for public policy reasons); <u>Capitol Indem. Corp. v. Fleming</u>, 58 P.3d 965, 969-70 (Ariz. App. 2002) (determining that assignments that violate public policy are void); <u>J.G. Wentworth S.S.C. Ltd. P'ship v. Callahan</u>, 649 N.W.2d 694, 697 (Wis. App. 2002) (stating that a contractual right cannot be assigned if it would violate public policy); and <u>Kobbeman v. Oleson</u>, 574 N.W.2d 633, 640 (S.D. 1998) (noting that a portion of an assignment was void because it was against public policy).  Here, Dockstader as President of Dataport and Turbo ISP assigned the corporations' rights to the money in the seized bank accounts to Jewell.  Accordingly, the court must determine whether such an assignment is allowed by public policy.

Generally, "[a]n officer or agent of a corporation has no authority to use its funds or securities to pay personal debts or obligations or as collateral for personal loans."  2 Fletcher Cyc. Corp. § 447.  Courts in Arizona, South

---

[5] An assignment can be prohibited in circumstances other than those in which the assignment violates public policy.  <u>See</u> Restatement (Second) of Contracts § 317 (stating that a contractual right can be assigned unless the assignment would materially change the duties of the contractual parties, the assignment is forbidden by statute, or the assignment is precluded by contract).

Dakota, Washington, and Wisconsin have recognized and applied this general proposition. See Hitching Post Lodge Inc. v. Kerwin, 412 P.2d 91, 93 overruled on other grounds, 420 P.2d 273 (Ariz. 1966) (stating that an officer of a corporation cannot write corporate checks or otherwise use corporate funds to pay his personal debts); Lake Mills Feed & Fuel Co. v. Peterson, 254 N.W. 536, 537 (Wis. 1934) (stating that "[a]n officer or stockholder of a corporation has no ostensible authority to divert the assets of the corporation to the payment of his debts"); State v. Lynch, 217 N.W. 391, 392 (S.D. 1927) (finding that because it was unknown whether the president of the corporation who executed the note had authority to do so, the note did not constitute an indebtedness against the corporation); Hoffman v. M. Gottstein Inv. Co., 172 P. 573, 574 (Wash. 1918) (stating that "[u]ndoubtedly the general rule is that one who receives from an officer of a corporation the notes or securities of such corporation, in payment of, or as security for, a personal debt of such officer, does so at his own peril [and that] [p]rima facie the act is unlawful"). Other courts have also determined that an officer cannot use corporate assets for his own personal use. Zakibe v. Ahrens & McCarron Inc., 28 S.W.3d 373, 383 (Mo. App. 2000) (stating that generally neither the executive officers nor the directors of a corporation have a right to convert its assets to their own use, or give them away, or make any self-serving disposition of them against the interest of the company); McKenney v. Campbell, 230 P. 228, 229 (Okla.

1924) (stating that a corporation's president and general manager cannot apply corporate funds to payment of his individual debts); and <u>Security Bank of Minnesota v. Kingsland</u>, 65 N.W. 697, 700-701 (N.D. 1895) (finding that a loan transaction was prima facie illegal because it involved the indorsement and delivery of the property of the corporation to secure a personal loan to the officer). Because such actions are prohibited by law, such actions are against public policy. This is further supported by the fact that Restatement (Second) of Contracts § 193 provides that a promise by a fiduciary that tends to induce a violation of a fiduciary duty, which includes acting for the fiduciary's own personal benefit, is unenforceable on the grounds of public policy.

Based upon the facts in this case, the court finds that the assignment of the corporations' funds made by Dockstader as the corporations' presidents is unenforceable because it violates public policy. Here, Dockstader, as an individual, became indebted to Jewell for the purchase price of both Dataport and Turbo ISP and signed a promissory note that obligated him personally to pay Jewell a certain amount of money. Dockstader, as an individual, also granted Jewell a security interest in his shares of the corporations. Thus, the record indicates that Dockstader was personally indebted to Jewell.[6] When

---

[6] Although Jewell entered into a guaranty agreement directly with the corporations, this agreement does not make the assignment valid. While Jewell did enter into a guaranty agreement with the corporations in which the corporations guaranteed that Dockstader, as an individual, would fully pay Jewell for the purchase of the corporations, the court finds that such an

Dockstader, as president of the corporations, assigned the corporations' rights to the seized bank accounts to Jewell, Dockstader, as an officer of the corporations, was making such an assignment to satisfy his own personal obligations to Jewell. Accordingly, the assignment made by Dockstader, as president of the corporations, violated public policy and therefore was not a valid assignment.

### 2. Valid Ownership

Even if the corporations did have a valid ownership interest in the Dataport and Turbo ISP accounts, Jewell can not have Artile III standing based upon the assignment by Dockstader because as discussed above such assignment was invalid. Therefore, the court need not address the validity of the corporations' ownership interests.

**II.  Jewell's Article III Standing Based Upon His Security Interest in the Dataport and Turbo ISP Accounts**

Because Jewell does not have standing based upon the assignment of the bank accounts, the court will determine whether Jewell has Article III standing based upon his own purported security interest in the bank

agreement is unenforceable because it makes the corporations liable for an individual officer's liabilities. Based upon the above case law, Dockstader could not lawfully use the corporate assets to satisfy his own personal obligations and, therefore, the guaranty agreement does not make the corporations indebted to Jewell. Additionally, the business security agreements entered into between Jewell and the corporations do not make the assignment valid. These agreements do not indebt the corporations to Jewell but rather secure the corporations' purported debt.

accounts.  As noted above, Dataport and Turbo ISP entered into business

security agreements with Jewell.  In those agreements, the corporations

granted Jewell a security interest in certain collateral, including bank

accounts, belonging to the corporations.  Docket 172-3, at 6, 11.  The

agreements state that after a default by the corporations and upon demand by

Jewell, the corporations will release the collateral to Jewell.  Id.  Because the

guaranty agreements entered into between Jewell and the corporations violate

public policy as set forth previously, the security business agreements are

invalid.  These agreements secure a nonexistent debt on behalf of the

corporations.  Accordingly, Jewell has no interest in the Dataport and Turbo

ISP accounts.

Even if Jewell had a security interest in the Dataport and Turbo ISP

accounts, based upon the security interest Dockstader, as an individual,

granted in his corporate shares to Jewell, Jewell still does not have standing

based upon his security interest in the corporations' collateral.  In this

analysis, the court must determine whether Jewell's security interest in the

corporations' collateral is a perfected security interest because "federal courts

have consistently held that unsecured creditors do not have standing to

challenge the civil forfeiture of their debtors' property."  United States v. One-

Sixth Share of James J. Bulgar in All Present and Future Proceeds of Mass

Millions Lottery Ticket No. M246233, 326 F.3d 36, 44 (1st Cir. 2003).  See also

United States v. $20,193.39 U.S. Currency, 16 F.3d 344, 346 (9th Cir. 1994) (determining that unsecured creditors cannot claim an interest in any particular asset that makes up the debtor's estate and as a result they do not have standing to contest forfeiture of their debtor's property); United States v. 127 Shares of Stock in Paradigm Mfg., Inc., 758 F. Supp. 581, 583 (E.D. Cal. 1990) (stating that "[g]eneral unsecured creditors do not have standing to contest the forfeiture of property of their debtor"); and United States v. $3,799.00 in U.S. Currency, 684 F.2d 674, 678 (10th Cir. 1982) (determining that an unsecured creditor did not have any actual or constructive possession of the forfeiture money and therefore did not have standing to contest the forfeiture). Consequently, if Jewell's security interest in the corporations' bank accounts is unsecured, he lacks Article III standing to contest the forfeiture of the bank accounts.

### A.    Applicable Law

In the context of  Article III standing, "ownership interests are defined by state law."  United States v. Premises Known as 7725 Unity Ave., N. Brooklyn Park, Minn., 294 F.3d 954, 956 (8th Cir. 2002).  Dataport is incorporated in South Dakota and therefore the court will apply South Dakota law when deciding whether Jewell has a perfected security interest in the Dataport account.  Under SDCL 57A-9-304(a), "[t]he local law of a bank's jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of

a security interest in a deposit account maintained with that bank." Turbo ISP is incorporated in Washington and therefore the court will apply Washington law when deciding whether Jewell has a perfected security interest in the Turbo ISP account. Under RCW § 62A.9A-304(a), "[t]he local law of a bank's jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in a deposit account maintained with that bank." Therefore, it is irrelevant whether the court applies South Dakota law or Washington law, the result is the same–the local law of the bank's jurisdiction governs perfection.

To determine the bank's jurisdiction, it is again immaterial whether the court applies Washington law or South Dakota law. In this case, pursuant to RCW § 62A.9A-304(b)(4), the bank's jurisdiction is "the jurisdiction in which the office identified in an account statement as the office serving the customer's account is located." Similarly, under SDCL 57A-9-304(b)(4), the bank's jurisdiction is "the jurisdiction in which the office identified in an account statement as the office serving the customer's account is located."[7]

---

[7] These subsections of the statutes apply because the deposit account agreement between the bank and the corporations did not expressly provide that a particular jurisdiction was the bank's jurisdiction, did not expressly provide that the agreement was governed by the law of a particular jurisdiction, and did not expressly provide that the deposit account was maintained at an office in a particular jurisdiction. Rather, the relevant deposit account agreement in relation to the Dataport and Turbo ISP accounts states that "[a]ny action regarding [an] account must be brought in the state whose law governs or controls [the] account." Docket 172-9 at 40.

An account statement for both the Dataport and Turbo ISP accounts indicates that the Colville branch office is the office serving the accounts. Docket 168. Because the Colville Branch is located in Washington, the court must apply Washington law to determine if Jewell has a perfected security interest.

## B. Security Interest

Under Washington law, a security interest in a deposit account, such as the Dataport and Turbo ISP accounts, can be perfected only by control. See RCW §§ 62A.9A-312 and 62A.9A-314. Thus, Jewell could only perfect his security interest in the Dataport and Turbo ISP accounts by being in control of those accounts. Significantly, the business security agreements entered into by Jewell, Dataport, and Turbo ISP recognized that Jewell needed to take control of the deposit accounts. See Docket 172-2 at 7, 12. In order for a secured party to have control over a deposit account, one of the following requirements must be satisfied:

> (1) The secured party is the bank with which the deposit account is maintained;
> (2) The debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor; or
> (3) The secured party becomes the bank's customer with respect to the deposit account.

RCW § 62A.9A-104(a). Here, Jewell did not have control over the accounts because he cannot meet any of the above outlined requirements. First, Jewell

is not the bank with which the deposit account is maintained.  The Bank of

America maintains the Dataport and Turbo ISP accounts and is not claiming it

is a secured party.  Second, there is no evidence of an authenticated

agreement that indicates that the bank was to follow the directions of Jewell in

relation to disposition of the corporations' funds.  The fact that such an

agreement does not exist is further supported by the stock purchase

agreement entered into between Jewell and Dockstader.  In that agreement,

the parties agreed to execute all required documentation to remove Jewell

from all existing corporation bank accounts and to transfer all authority over

the bank accounts to Dockstader.  Docket 172-2 at 7.  Additionally, there is

nothing in the security business agreements that indicates that Jewell could

direct the disposition of the corporations' funds.  <u>See</u> Docket 172-3 at 6-15.

Third, the record is devoid of any evidence showing that Jewell became a

customer of the Bank of America with respect to the Dataport and Turbo ISP

accounts.  Further, Jewell testified that the accounts which he had authority

to sign for on behalf of the corporations were closed prior to the sale of the

corporations to Dockstader and that Dockstader opened new corporate

accounts for the corporations.  Docket 172-4 at 9.  As a result, under

Washington law, Jewell does not have a perfected security interest in the

Dataport and Turbo ISP accounts.  Thus, Jewell does not have Article III

standing to contest the civil forfeiture of these accounts based upon his security interest in the accounts.

Based on the foregoing, it is hereby

ORDERED that the government's motion for summary judgment (Docket 171) is granted with respect to the Dataport and Turbo ISP bank accounts, which are the two remaining bank accounts in this case.

IT IS FURTHER ORDERED that Jewell's motion for immediate dismissal or court-ordered jury trial (Docket 183) in relation to the Dataport and Turbo ISP accounts is denied as moot.

Dated March 24, 2009.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE